IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TANNIE LAROCCA                              :
                                            :        CIVIL ACTION
        v.                                  :
                                            :        NO. 22-2806
U.S. ATTORNEY GENERAL                       :
MERRICK GARLAND                             :

## MEMORANDUM

**Chief Judge Juan R. Sánchez**                              **October 5, 2023**


Defendant Merrick Garland, the United States Attorney General, has filed a motion for summary judgment on Plaintiff Tannie LaRocca's claims that she was subject to discrimination and retaliation in violation of the Americans with Disabilities Act, the Pregnancy Discrimination Act, and Title VII of the Civil Rights Act while employed by the Department of Justice, Federal Bureau of Investigation (FBI).  The motion shall be granted as to LaRocca's disability-related claims and her claim for pregnancy discrimination but denied as to her Title VII claim for retaliation.

**STATEMENT OF FACTS**

Tannie LaRocca was employed as an Information Technology Specialist by the FBI in its Philadelphia field office from August 15, 1999 through April 8, 2019, when she "was told she was

1

effectively terminated."[1]  Def.'s Statement of Undisputed Material Facts  ¶¶ 1, 2, ECF No. 23.[2]

Throughout her employment, LaRocca worked in and was responsible for providing IT services at

the FBI's auxiliary workspace at 701 Market Street, across the street from its primary offices in

the Green Federal Building at 600 Arch Street in Philadelphia.  *Id.* ¶¶ 3-4.  Beginning in July 2014,

LaRocca's immediate supervisor was Joanna Viscome, who held the position of Supervisory

Information Technology Specialist.  From June 2017 through December 2019, Viscome reported

to Joseph Bushner, the Assistant Special Agent in Charge ("ASAC") of the FBI's Philadelphia

field office.  *Id.* ¶ 5.

On September 20, 2016, LaRocca gave birth to a child and commenced an approved, six-

month maternity leave which lasted into March 2017.  *Id*. ¶¶ 15-17.  From the inception of her

employment with the FBI until her maternity leave, LaRocca worked a full-time, 40-hour-per-

week schedule.  *Id.* ¶ 14.  Before beginning her leave, LaRocca notified Viscome that she was

thinking about working a part-time, 30-hour-per-week schedule after she returned to work.  *Id.* ¶

19.  Upon LaRocca's return in March 2017, Viscome and the FBI approved her request to work

part-time, subject to annual review and renewal, and LaRocca maintained a part-time schedule

until her termination in 2019, working eight hours on Mondays, Wednesdays, and Thursdays, six

hours on Tuesdays, and having Fridays off.  *Id*. ¶¶ 21, 23, 24.  Viscome believed LaRocca sought

---

[1]  As discussed below, LaRocca was terminated after she was placed on a 90-day Performance
Improvement Plan ("PIP") and failed to improve by the time the PIP ended on December 18, 2018.
LaRocca was notified by letter dated January 31, 2019 that she was being immediately suspended
from duty with intent to terminate pending the final resolution of her proposed removal.  Def.'s
Statement of Undisputed Material Facts, Exs. 21 and 22, ECF Nos. 23-22, 23-23.  LaRocca
appealed her pending termination but the decision to terminate was ultimately upheld following a
hearing by the FBI Human Resources Branch appeal board on April 8, 2019.  Def.'s Statement of
Undisputed Material Facts  ¶¶ 143-44, 148-50, 152.

[2]  LaRocca has admitted nearly all of the facts set forth in Garland's Statement of Undisputed
Material Facts and all of the facts set forth in the portions of the Statement cited herein.

the part-time schedule because of childcare needs, and in her application for renewal of the arrangement for 2018, LaRocca reported "Life Changing Event – Baby/Toddler" and "care of Disabled Family Member" as the reasons for asking to be allowed to continue to work part-time. *Id*. ¶¶ 20, 22.

While she was on maternity leave, LaRocca applied for the FBI's Voluntary Leave Transfer Program ("VLTP"), under which employees who lack sufficient accrued leave to cover their full leave period can receive donations of leave from other employees. *Id.* ¶¶ 25-26. LaRocca's initial VLTP application was denied by the Human Resources Division ("HRD") of the FBI's Human Resources Branch ("HRB") for lack of medical documentation. The HRD sent notice of the denial to Viscome, who forwarded it to LaRocca on February 21, 2017. *Id.* ¶¶ 28-30. LaRocca re-submitted her application with medical documentation, but she again received notice from the HRD on August 3, 2017 that her application was deficient as the first page was missing. That same day, LaRocca submitted a third VLTP application, signed by Viscome which was finally approved on August 28, 2017, and leave donations were thereafter solicited for her.[3] *Id*. ¶¶ 32-34.

Although there had been some complaints about LaRocca's job performance and her responsiveness to requests for assistance and IT service over the years, they had largely been informally resolved by Viscome and the Assistant Special Agent(s) in charge. Pl.'s Counter-Statement of Material Facts in Opposition to Def.'s Mot. Summ. J. at ¶¶ 14, 20, ECF No. 29; Def.'s Statement of Undisputed Material Facts at ¶¶ 100-01, 105-07; Def.'s Mot. Summ. J., Ex. 26, ECF No. 23-27. However, on May 31, 2018, a complaint about LaRocca's performance was raised to

---

[3] There is no evidence in the record as to whether LaRocca still needed donated leave or why it was needed nor is there any evidence that she ever received any leave donations.

the Special Agent in Charge ("SAC") Advisory Committee, a forum for Philadelphia Field Office employees to anonymously raise office concerns to, and to provide and receive feedback from, the SAC. Def.'s Statement of Undisputed Material Facts ¶¶ 102-104. The complaint reported that LaRocca provided poor customer service to the FBI employees in the 701 Market Street building and was unable to resolve their IT issues. This development had the effect of elevating LaRocca's performance issues above Viscome and Bushner to the SAC. *Id*. at ¶¶ 105-107. As a result, with the agreement of the SAC, Bushner determined to place LaRocca on a 90-day PIP. After the plan was developed, LaRocca was given a letter of counseling and placed on the PIP on September 19, 2018. *Id.* ¶¶ 108-20. Thereafter, weekly meetings to discuss LaRocca's progress were held from September 26, 2018 through December 13, 2018. *Id.* ¶ 121. Upon the expiration of the PIP opportunity period on December 18, 2018, Viscome and Bushner concluded LaRocca had failed to improve to the "minimally successful" level on the critical elements of time management and customer service performance and should therefore be terminated. *Id.* ¶¶ 124-26. The SAC agreed with the recommendation to terminate LaRocca. The recommendation was also approved by the HRD Section Chief in Washington, D.C., who informed LaRocca by letter dated January 31, 2019 that she was immediately suspended from duty with the intention to terminate. *Id.* ¶¶ 127-38; Def.'s Mot. Summ. J. Exs. 21, 22, ECF Nos. 23-22, 23-23. LaRocca received the January 31, 2019 letter, which explained her right to appeal the decision, on February 4, 2019. Def.'s Statement of Undisputed Material Facts ¶¶ 140-41. LaRocca did appeal the decision to the Executive Assistant Director of the FBI's HRB and, along with her representative, orally presented her appeal to the appeal board on April 4, 2019. The appeal board found the reasons for the termination to be "fully supported" and found LaRocca had not presented "compelling reasons to reverse the decision."

*Id.* ¶¶ 143-44, 148-50.  LaRocca was advised of her removal by letter dated April 8, 2019.  *Id.* ¶ 152.

A few months before the complaint about LaRocca's performance was raised to the SAC Advisory Committee, LaRocca internally filed a lengthy informal EEO complaint against Viscome on February 15, 2018, alleging Viscome had discriminated and retaliated against her based on her age, parental status, disability/injury, and favoritism, and providing a long list of incidents to support her contentions.  Def.'s Mot. Summ. J. Ex. A at 15-20, ECF No. 22-3.  Then on April 11, 2018, LaRocca internally filed a formal EEO complaint against Viscome based on the same allegations, together with a few others.  *Id.* at 3-20.  LaRocca later sought leave to amend her internally-filed EEO to include additional instances of discrimination/retaliation via a series of emails sent in August and September 2018.  The Department of Justice accepted most of these as being related to her prior formal EEO filings.  Def.'s Mot. Summ. J. Ex. B, ECF No. 22-4.  As a result of these amendments, the deadline for the FBI to complete its investigation and issue a decision on LaRocca's EEO filings was extended to March 18, 2019.  *Id.*  On June 17, 2019, LaRocca filed another internal formal EEO complaint alleging discrimination/retaliation on the basis of her age, sex, disability and parental status arising out of her suspension from duty and ultimate termination.  Def.'s Mot. Summ. J. Ex. C, ECF No. 22-5.

On February 25, 2020, the Department of Justice Complaint Adjudication Office issued its final agency decision on LaRocca's EEO complaints against the FBI, finding the record did not support her claims of discrimination or hostile work environment based on sex, disability, parental status, or EEO activity.  Def.'s Mot. Summ. J. Ex. E, ECF No. 22-7.  LaRocca appealed the DOJ's decision to the U.S. Equal Employment Opportunity Commission on August 19, 2020, and the

EEOC subsequently affirmed it on May 26, 2022.  Def.'s Mot. Summ. J. Ex. F, ECF No. 22-8.

LaRocca filed this civil action on July 18, 2022.  ECF Nos. 1, 22.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to any claim or defense, and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…; [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Stone v. Troy Constr., LLC,* 935 F.3d 141, 148 n. 6 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 248 (1986)).

A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (*per curiam).*  "A party will not be able to withstand a motion for summary judgment merely by making allegations." *In re Tribune Media Co.*, 902 F.3d 384, 392-393 (3d Cir. 2018) (quoting *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)).  "Instead, the nonmoving party must 'designate specific facts' in the record to 'show that there is a genuine issue for trial.'" *Id*. (quoting *Celotex v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").   In other words, "[t]he moving party is entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'"   *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (citation omitted).

**DISCUSSION**

Garland first moves for summary judgment on LaRocca's claims for disability discrimination and retaliation in Count I of the Amended Complaint arguing  that the Americans with Disabilities Act ("ADA") does not apply to the United States.  This argument is well taken.  The United States has been specifically excepted from the ADA's definitions of an "employer" and a "covered entity" in 42 U.S.C. § 12111(2), (5)(B)(i).  *See Smith v. Pallman*, 420 F. App'x 208, 214 (3d Cir. Mar. 30, 2011) (holding dismissal of plaintiff's ADA claim "was proper because the ADA does not apply to federal agencies").  In fact, in her memorandum in opposition to the motion for summary judgment, LaRocca acknowledges the ADA does not apply to the FBI, and attributes the reference to the claim as under the ADA to a "scrivener's error."  Although LaRocca averred she would be filing a motion to amend pursuant to Federal Rule of Civil Procedure 15 to instead plead a claim under the Rehabilitation Act and "clear up any discrepancy about the complaint and provide the proper record for this case to move forward," such a motion has yet to be filed.  Count I shall therefore be dismissed.  Pl.'s Mem. Opp'n. Mot. Summ. J. 4-5, ECF No. 29.  And because the record in this matter does not support a claim under the Rehabilitation Act[4]

---

[4]  Section 504 of the Rehabilitation Act provides, in relevant part:

> **(a) Promulgation of rules and regulations.**  No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. § 705(20)] shall, solely by reason of her or his disability, be excluded from the

7

either, amendment would be futile.  *See Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (holding "[a]mong the factors that may justify denial of leave to amend are undue delay, bad faith and futility").

The Rehabilitation Act is applicable to federal employers and employers who receive federal funding.  *Shiring v. Runyon*, 90 F.3d 827, 830-31 (3d Cir. 1996).  The Act forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement, *id,* and expressly makes the standards set forth in the ADA applicable to federal employers and those receiving federal funds.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); 29 U.S.C. §§ 791(f), 794(d).  Because "the ADA, ADEA and Title VII all serve the same purpose - to prohibit discrimination in employment against members of certain classes[,] . . .  it follows that the methods and manner of proof under one statute should inform the standards under the others as well."  *Wishkin*, 476 F.3d at 185 (internal citation omitted).  "Accordingly, the familiar framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793-94 (1973), for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act."  *Id.*

Under the *McDonnell Douglas* paradigm, the plaintiff has the initial burden to make a prima facie showing of discrimination.  If she does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action.  *McDonnell Douglas*, 411 U.S. at 802-803.  Should the employer articulate such a reason, the burden then

---

participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance, or under any program or activity conducted by any Executive agency or by the United States Postal Service. . . .

29 U.S.C. § 794.

returns to the plaintiff to make some showing that the nondiscriminatory reason given is not legitimate but is instead a pretext for discrimination. *Id.* at 804.

In the context of a claim of discrimination under the Rehabilitation Act, a plaintiff must initially show (1) she has a disability, (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) she was nonetheless terminated or otherwise prevented from performing the job. *Wishkin*, 476 F.3d at 184-85 (quoting *Shiring*, 90 F.3d at 831).   The Rehabilitation Act defines an "individual with a disability" as someone who (1) has a physical or mental impairment that substantially limits her major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. *Kania v. Potter*, 358 F. App'x 338, 341 (3d Cir. 2009) (citing 29 U.S.C. § 705(20)(B) and 42 U.S.C. § 12102(1)).  "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii).  To prove pretext in a Rehabilitation Act claim, a plaintiff may either (1) discredit the employer's proffered reasons, either circumstantially or directly, or (2) adduce evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.   *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 148 (3d Cir. 2018) (citing *Shiring*, 90 F.3d at 185).

To make out a prima face case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) she was engaged in protected activity; (2) she suffered a materially adverse action, either after or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Kendall v. Postmaster Gen. of the U.S.*, 543 F. App'x 141, 144 (3d Cir. 2013); *Fogelman v. Mercy Hosp.*, 283 F.3d 561, 567-568 (3d Cir. 2002).  "To establish the requisite causal connection, a plaintiff usually must prove either (1) an

unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

In Count I of her Amended Complaint, LaRocca alleges she was subjected to harassment, discrimination, retaliation, and termination because she requested "a reasonable accommodation of part time light duty work, as well as time off from work to recover from her medical condition, and time off from work to get corrective surgery." [5] Am. Compl. ¶ 28.  Turning first to LaRocca's disability discrimination claim, LaRocca maintains she has a back disability resulting from back pain and a back injury she experienced during her pregnancy.  LaRocca alleges her disability arose in July 2016 when she began to suffer back pain as the result of her pregnancy.  Am. Compl. ¶ 10. She further alleges she injured her back during the delivery of her child "on or around September 19, 2016." *Id.* ¶11.  Although Viscome knew LaRocca had back issues upon her return from maternity leave, Viscome had no information about what these issues were or about any limitations resulting from them.  Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. G at 22-27; Def.'s Statement of Undisputed Material Facts, Ex. 14, ECF 23-15. None of the medical records from LaRocca's medical providers, including her obstetrician, contain  any reference to back pain or any disability in July 2016, and while LaRocca had previously treated with a chiropractor following an auto accident in 2013, she had no treatment with her chiropractor from December 28, 2013 through June 7, 2017.  Def.'s Statement of Undisputed Material Facts ¶¶42-43, 45.  There is also no mention in either the notes from LaRocca's hospital stay for her child's delivery or the FMLA

---

[5]  Because LaRocca does not plead harassment as a separate or stand-alone claim, the Court finds the reference to a "harassing work environment in retaliation for her requests for reasonable accommodation" is solely in the context of LaRocca's claim for retaliation.  Am. Compl. ¶ 32.  In any event, there is absolutely no evidence in the record that LaRocca was ever harassed.

form completed by LaRocca's obstetrician of a back or other injury during childbirth. *Id.* at ¶¶ 46, 47, 49. The only reference to back pain in the hospital notes reflects that in response to a question regarding back pain two days after delivery, LaRocca scored it a 2 out of 10 and described it as "mild." *Id.* ¶ 48. The FMLA form refers only to LaRocca's need for leave to recover from childbirth and care for her newborn during the period of September 20, 2016 through January 12, 2017. *Id.* ¶ 50.

LaRocca did report in an office visit to her gynecologist on August 3, 2017 that her "back pain was aggravated after childbirth so she had to seek treatment with chiropractor and acupuncture," but she also reported the pain was "now getting better." *Id.* ¶ 52. According to an FMLA form submitted by Paula DiMaio, D.C., the chiropractor with whom LaRocca had previously treated for her 2013 a motor vehicle accident injury, LaRocca "resumed chiropractic care on 06-02-17 stating the [prior] complaints never fully went away after the accident." *Id.* ¶¶ 45, 53, Ex. 29, ECF No. 23-30; Pl.'s Resp. Opp'n. Mot. Summ. J. 95-103. LaRocca also reported "back labor"[6] to DiMaio. *Id.* LaRocca received chiropractic treatments from DiMaio three to five times per month from June through December 2017. *Id.* ¶¶ 55, 72 & Ex. 29. DiMaio did not identify any job functions LaRocca would be unable to perform or any specific limitations on LaRocca's major life activities. Instead, DiMaio noted only "prolonged lifting + standing, sitting, driving, reading, concentration + sleep affected." *Id.* ¶ 56. In 2018, LaRocca treated with DiMaio

---

[6] According to the American College of Obstetricians and Gynecologists ("ACOG"), "[b]ack labor refers to the intense lower back pain that many women have during labor and delivery. Some women even feel this pain between contractions. The pain is caused by the pressure of the fetus's head on the lower back." Def.'s Statement of Undisputed Material Facts ¶ 54 (quoting "Ask ACOG: What is back labor?" https://www.acog.org/womens-health-experts-and-stories/ask-acog/what-is-back-labor (Oct. 2020)).

only one to three times per month, and her "activities of daily living assessment scores" improved by 22% from 2017 to 2018.  *Id.* ¶¶ 72-73.

There is also no evidence that LaRocca herself ever characterized her back pain as a disability or that she did anything other than mention to her supervisors that she was having back pain and was in treatment for it.  *Id.* ¶¶ 61-66; Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. G at 23-26.  Indeed, LaRocca admitted she never reached out to or made any effort to contact the Reasonable Accommodations Unit of the FBI.  Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. A at 74-65.  By her last visit to DiMaio in January 2019, LaRocca's back pain had improved to a 0-1 on a pain scale of 1-10.  *Id.* ¶ 74;  Thus, while LaRocca had back pain, and Viscome and Bushner knew she suffered from back pain, there is no evidence on this record that the FBI had any record of LaRocca being disabled by her back pain, that it regarded her as disabled, or that her back pain ever substantially limited her major life activities.  Thus, LaRocca has failed to establish a genuine dispute of material fact as to the first element necessary of a prima facie case of discrimination under the Rehabilitation Act.

LaRocca also has failed to demonstrate she was denied reasonable accommodations.  It is undisputed that LaRocca received approval for six months of maternity leave and permission to work a part-time schedule upon returning to work.  The other accommodations LaRocca requested were hydraulic and two-tiered carts to assist with moving computer equipment, a standing desk, and more frequent use of the FBI's vehicle.  Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. A at 72.  The record shows that a hydraulic cart was available at the main FBI location across the street from LaRocca's work location, but LaRocca thought it was too heavy and cumbersome to move to her location.  She therefore requested her own hydraulic cart as well as a two-tier flatbed cart with a ledge to assist with moving computers in 2016 while she was pregnant, though she conceded "it

could have been prior to that in 2015." Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. A at 47-51, 65-68, ECF No. 29-1.  Even though other, non-hydraulic carts were already available in LaRocca's work area, Viscome agreed to check the budget to see if she could order the carts LaRocca wanted and told LaRocca she would see what she could do.  *Id.*; Def.'s Statement of Undisputed Material Facts ¶¶ 78-80, 82.  Ultimately, the carts were purchased for LaRocca using 2018 funding, and Viscome advised her she could pick them up on August 6, 2018.  Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. A at 56-63; Def.'s Statement of Undisputed Material Facts ¶ 81 & Ex.26, ECF 23-27.

As for the government car, while the FBI did not purchase a car for LaRocca, she already had access to one, although she found that access inconvenient.[7]  And LaRocca acknowledged that while Viscome had provided her the name of the person to contact to get a standing desk, she never emailed anyone other than Viscome to ask for one.  Pl.'s Resp. Opp'n. Mot. Summ. J., Ex. A at 64-65; Def.'s  Statement of Undisputed Material Facts, ¶¶ 83-84 & Ex. 14, ECF No. 23-15.  Thus, the Court finds LaRocca has failed to produce evidence from which a reasonable jury could find either that she was disabled or that she did not receive the reasonable accommodations she requested.

LaRocca additionally avers her request for time off to have back surgery caused her supervisors and employer to harass, discriminate, and retaliate against her and to ultimately terminate her employment.  Am. Compl. ¶ 22.  However, the back surgery to which LaRocca refers was scheduled for April 12, 2019, some two months after she was suspended from duty and several days after her termination was upheld by the HRB appeal board.  Def.'s Statement of Undisputed

---

[7]  To access the car, LaRocca had to walk across the street and go ninth floor of the Green Building to get the keys, descend to the building's basement garage to get the vehicle, and then drive around the block to the loading dock area of 701 Market Street, where she had to get keys to the freight elevator from the building's security personnel to obtain or deliver equipment.  Pl.'s Resp. Opp'n. Mot. Summ. J. Ex. A, at 72-78.

Material Facts, ¶¶ 35-36, 38.  This surgery was also not related to LaRocca's prior back issues, but was rather "corrective surgery" to remove a "lipoma-like mass" on the upper back which was "giving her discomfort when she lays on it." *Id.* ¶ 37.  Accordingly, there is no nexus between this accommodation request and the discrimination, harassment, and retaliation claimed here.

The record similarly does not support LaRocca's contention that she was terminated in retaliation for requesting a reasonable accommodation.  Again, to establish a prima facie case of retaliation, LaRocca must show: (1) she was engaged in protected activity; (2) she suffered a materially adverse action either after or contemporaneous with the protected activity; and (3) a causal connection between her protected activity and the adverse action.  Accepting that requesting a reasonable accommodation constitutes protected activity, LaRocca has not produced evidence from which a reasonable jury could find that her termination was causally connected to her request for accommodations.  LaRocca submitted her request for maternity leave in 2016 and her first request for a part-time schedule in early 2017.  Both of those requests were granted, and LaRocca was on leave from September 20, 2016 until approximately March 20, 2017, when she returned to work part-time.  Def.'s Statement of Undisputed Material Facts, ¶¶ 15-19, 21, 23 & Ex. A at 36-37.  Likewise, LaRocca's requests to continue working that part-time, thirty-hour-per-week schedule were also approved and LaRocca's work schedule remained unchanged from the time she returned from maternity leave until she was suspended in January 2019.  *Id.* ¶¶ 21, 24.  As outlined above, all of LaRocca's other requested accommodations were provided or made available in a timely fashion, although LaRocca's personal carts were not purchased until late July/early August of 2018.  Given that LaRocca was placed on a PIP on September 19, 2018, and effectively terminated/suspended with intent to terminate on January 31, 2019, the Court cannot find she suffered a materially adverse action shortly after or contemporaneously with her maternity

leave, assumption of a part-time work schedule, other requests for reasonable accommodations, or request for medical leave for corrective surgery.   Hence, giving LaRocca leave to amend her complaint to "correct" Count I to state a cause of action under the Rehabilitation Act would be futile.   Judgment shall therefore be entered in favor of the Attorney General on Count I of LaRocca's Amended Complaint.

In Count II, LaRocca pleads a claim for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 and as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).   Specifically, under Title VII it is an "unlawful employment practice" for an employer –

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive, or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).   The Pregnancy Discrimination Act makes clear that "pregnancy, childbirth or related medical conditions" are all included in the prohibition against discrimination on the basis of sex.   *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294 (3d Cir. 1997).

As noted, Title VII claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework discussed above.   To establish a prima facie case of pregnancy discrimination, a plaintiff must show: (1) she is a member of a protected class, *i.e.*, is or was pregnant and her employer knew it; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) there was a nexus between her pregnancy and the adverse action suffered.   *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 365, 366 (3d Cir. 2008).   The evidence most often used to show a nexus

is disparate treatment whereby a plaintiff shows she was treated less favorably than similarly situated employees who are not in her protected class. *Id*. at 366.

Title VII also makes it unlawful for an employer to retaliate against an employee because she has opposed any practice made an unlawful employment practice by the statute. *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021). To survive summary judgment on a retaliation claim, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Id.*

In this case, LaRocca has adduced sufficient evidence to establish she was pregnant, her employer knew she was pregnant, she was qualified for the position which she held for nearly twenty years, and she suffered an adverse employment action, that is, termination. However, for the same reasons outlined above, the Court cannot find a causal connection between LaRocca's pregnancy and her termination, which did not occur until some two and a half years after she returned from maternity leave and only after she failed her PIP. Consequently, judgment shall be entered in favor of the Attorney General on the Title VII/Pregnancy Discrimination Act claim set forth in Count II.

Although the evidence is minimal and the decision is a close call, the Court reaches a different conclusion as to LaRocca's Title VII retaliation claim. Viewing the record in the light most favorable to LaRocca as is required on a motion for summary judgment, LaRocca filed several internal EEO complaints beginning in mid-February 2018. In those complaints, which were directed against Viscome, LaRocca cited a rather lengthy list of instances of what she believed to be discriminatory conduct on Viscome's part directed at LaRocca based on, *inter alia,* her age, parental status and pregnancy disability. Although these complaints were ultimately found

by the Department of Justice Complaint Adjudication Office to be unsupported, it was just a few months after LaRocca made the complaints that she was placed on the PIP at the behest of Viscome and Bushner.  The Court finds this admittedly scant evidence is sufficient to give rise to the inference that there was a causal connection between LaRocca's participation in the protected activity (the EEO process) and the ultimate termination of her employment.  Summary judgment shall therefore be denied as to the retaliation claim in Count II.

**CONCLUSION**

Because the ADA does not apply to the United States and the evidence does not support LaRocca's claims for disability/retaliation discrimination under the Rehabilitation Act either, summary judgment shall be granted in its entirety on Count I of LaRocca's Amended Complaint. The motion shall be granted in part as to Count II of the Amended Complaint and judgment shall also be entered in favor of the Attorney General on LaRocca's claim that she was the victim of pregnancy discrimination in violation of Title VII.  As sufficient evidence exists to warrant submission of LaRocca's Title VII retaliation claim to a jury, however, the remainder of the motion shall be denied.

An appropriate Order follows.

BY THE COURT:


/s/  Juan R. Sánchez
_____
Juan R. Sánchez,         C.J.

17